# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Bailey*, 2013 IL 113690

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DARIUS BAILEY, Appellant. |
| Docket No. | 113690 |
| Filed | March 21, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where the jury in a capital case returned a general verdict of guilt of first degree murder after the denial of a defense request for special verdict forms for felony murder, which, along with other offenses, had also been charged, this was error that was not harmless because it had sentencing consequences, and the trial court's life sentence, imposed as one of the alternatives available at the capital sentencing hearing at which it acted as trier of fact, was vacated, with a remand for resentencing to a term of years within the applicable sentencing range for felony murder. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Frank Zelezinski, Judge, presiding. |
| Judgment | Appellate court judgment reversed in part.<br>Circuit court judgment vacated in part.<br>Cause remanded. |

| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Heidi Linn Lambros, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant |
|---|---|
| | Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins and Douglas P. Harvath, Assistant State's Attorneys, of counsel), for the People. |
| Justices | JUSTICE GARMAN delivered the judgment of the court, with opinion. |
| | Chief Justice Kilbride and Justices Freeman, Thomas, Karmeier, Burke, and Theis concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant Darius Bailey was charged in the circuit court of Cook County with intentional, knowing, and felony murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2006)), and with the predicate crimes of home invasion (720 ILCS 5/12-11(a)(3) (West 2006)), and robbery of an individual 60 years of age or older (720 ILCS 5/18-1(a), (b) (West 2006)), in connection with the death of 80-year-old Robert Winter. After the State announced its intent to seek the death penalty, defendant elected to have the trial court determine his eligibility for the death sentence. At trial, his request for separate verdict forms on the two counts of felony murder was denied. The jury found him guilty of first degree murder, home invasion, and robbery. The trial court found him eligible for the death penalty, but sentenced him instead to concurrent terms of natural life, 30 years, and 15 years respectively. The appellate court found that the circuit court erred by refusing defendant's request for separate felony-murder verdict forms, but that he was properly sentenced to a term of natural life without the possibility of parole. 2011 IL App (1st) 090074-U. This court granted his petition for leave to appeal pursuant to Supreme Court Rule 315 (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)), to determine whether the error in refusing the separate verdict forms, if any, requires that defendant be resentenced to a term of years.

¶ 2                                    BACKGROUND

¶ 3    While he was walking along 144th Street in Riverdale, defendant was stopped by a police detective who informed him that he was wanted for questioning by the Dolton, Illinois, police department in connection with a burglary. The detective took him into custody and searched him before placing him in a squad car. Defendant was found to be in possession of a checkbook bearing the name Robert Winter. The address on the checks was 102 E. 144th St., Riverdale. Defendant was also carrying a set of keys, which were returned to him.

¶ 4      As defendant was being transported to the police station, the officer who was driving the squad car heard him drop an object on the floor of the car. A search of defendant upon his arrival at the police station revealed that he no longer had the keys. The officer searched the car and found the keys underneath the driver's seat. When shown the keys, defendant stated that they belonged to his aunt and had fallen out of his pocket. One of the keys was later determined to be Winter's car key; another was the key to Winter's house.

¶ 5      The detective who made the initial stop telephoned Winter, but did not get an answer. He went to the address given on the checks and found the deceased 80-year-old victim on the floor, covered with a blanket. An electrical cord, which had been removed from a lamp above the television, was wrapped around one of his buttocks and one thigh, then around his chest and one arm. The cord was wrapped twice around the victim's neck and double knotted.

¶ 6      Investigators found no evidence of forced entry. The victim's pants pockets were turned out. Two bedrooms were in disarray, with dresser drawers and closet doors open and personal belongings scattered on the bed and floor. In the living room, a china cabinet and a trumpet case were open and their contents strewn on the floor. Next to the body they found the contents of a wallet, including an insurance card and a plastic insert. Further investigation of the crime scene revealed a latent fingerprint on a drawer pull in Winter's bedroom and a latent palm print on a plastic wallet sleeve near the body. Both prints matched defendant.

¶ 7      After checking Winter's garage and finding his car missing, the detective called for a search for the car. It was found at 144th Street and Wentworth, several blocks from Winter's home and approximately 75 feet from the spot where the defendant had been taken into custody.

¶ 8      When questioned, defendant initially denied any involvement in the murder. He claimed to have found the checkbook and keys on the ground just before he was stopped by the detective. Later, he said that he had found these items the day before and went to the victim's house to return them, but then decided to take the car. Finally, he stated that he entered the house through the back door to find money or something else to steal. He was looking through the bedroom drawers when Winter came up from the basement and caught him. They "tussled" and he eventually tied Winter up with an electrical cord that he took from near the television and covered him with a jacket. As he left, he took Winter's checkbook, keys, and car. He denied intending to kill Winter.

¶ 9      The cause of death was determined to be manual and ligature strangulation. The medical examiner concluded that the victim was first manually choked and then strangled with the electrical cord. He was alive when the cord was used. There were no defensive wounds.

¶ 10      Before trial, the State filed a notice of intent to seek the death penalty alleging eligibility under two statutory factors: felony murder (720 ILCS 5/9-1(b)(6) (West 2006)), and murder of a victim over the age of 60 resulting from exceptionally brutal and heinous conduct indicative of wanton cruelty (720 ILCS 5/9-1(b)(16) (West 2006)). Defendant waived his right to a jury for both phases of his capital sentencing hearing if he should be convicted of first degree murder.

¶ 11      Defendant's videotaped statement was played at trial. He took the stand and repudiated the earlier statement. He testified that he was acquainted with Winter and that he used to do

odd jobs for the older man, whom he considered a mentor. On the date of his death, Winter allowed defendant to borrow his car. The checkbook was in the car and defendant had it with him because he planned to return it to Winter. He stated that he was "shocked and confused" when he was told by the detective that Winter was dead. He made the incriminating statements because the detective threatened him and told him what to say. He felt pressured, so he told the officer a "bunch of things."

¶ 12    At the jury instruction conference, defendant requested that the jury be given separate verdict forms for the felony-murder charges. The trial court denied the request, stating that because the jury would not be involved in sentencing, it was not necessary. The jury was given a general verdict form on the three murder charges. The jury returned verdicts of guilty of first degree murder, home invasion, and robbery.

¶ 13    At the death penalty eligibility hearing, the parties stipulated that defendant was 20 years old at the time of the offense. The court took "judicial notice of the verdicts taken by the jury" and found "beyond a reasonable doubt that the statutory aggravating factors do exist and that the murder was committed during the course of the felonies." After finding defendant eligible for the death penalty and hearing evidence and arguments in aggravation and mitigation, the trial court imposed concurrent sentences of natural life in prison for the murder, 30 years for home invasion, and 15 years for robbery "of a senior citizen."

¶ 14    Relying on this court's opinion in *People v. Smith*, 233 Ill. 2d 1 (2009), the appellate court found that the trial court's denial of defendant's request to give the jury a separate felony-murder verdict form was an abuse of discretion. The court further found that the natural life sentence was proper because the "jury's failure to specifically find that he had committed intentional murder[ ] did not render him ineligible for the death penalty." 2011 IL App (1st) 090074-U, ¶ 38. Because the court was the finder of fact in the eligibility hearing and was entitled to make its own assessment of defendant's mental state based on the evidence presented at trial, defendant was properly found eligible for the death penalty under section 9-1(b)(6) of the Criminal Code of 1961 and, therefore, for the alternative sentence of natural life in prison pursuant to section 5-8-1(a)(1)(b) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(b) (West 2006)). 2011 IL App (1st) 090074-U, ¶¶ 39-41. The appellate court also vacated the conviction and sentence for home invasion and reduced the conviction for robbery from a Class 1 to a Class 2 felony, resentencing him to seven years on this conviction. *Id.* ¶ 47.

¶ 15                                    ANALYSIS

¶ 16    The defendants in the consolidated cases in *Smith* were charged with first degree murder and predicate felonies in multicount indictments. Both defendants requested separate verdict forms on the felony-murder counts and both were denied. Both defendants were convicted of first degree murder and given consecutive sentences for the underlying felonies. *Smith*, 233 Ill. 2d at 5.

¶ 17    The State conceded that the sentencing consequences for the defendants would have been different if they had been found guilty of felony murder and not guilty of intentional or knowing murder. *Id.* at 18. Because the predicate felony underlying a charge of felony

murder is a lesser-included offense of the murder, the felony cannot support a separate conviction or sentence. *Id.* at 17. However, if such a defendant were found guilty of intentional or knowing murder, a separate conviction and sentence could be imposed for the predicate felony and the sentence for that felony would be imposed consecutively to the sentence for murder. *Id.* at 18.

¶ 18     This court held that where "specific findings by the jury with regard to the offenses charged could result in different sentencing consequences, favorable to the defendant, specific verdict forms must be provided upon request and the failure to provide them is an abuse of discretion." *Id.* at 23.

¶ 19     Further, when it is not possible to determine from a general verdict whether the defendant was actually found guilty of each count and when this lack of specificity has adverse sentencing consequences for a defendant whose request for separate verdict forms was refused, the error is not harmless. *Id.* at 25. The appropriate remedy in such a case is to "interpret the general verdict as a finding on felony murder" only. *Id.* at 28. As a result, the defendants' convictions and sentences for murder were affirmed, but the convictions and sentences for the predicate felonies were vacated. *Id.* at 29.

¶ 20     In *Smith*, the connection between the verdict forms and sentencing was clear. If the defendants had been found guilty of felony murder only, the predicate felonies could not have been sentenced consecutively, but if they had been found guilty of intentional or knowing murder as well as felony murder, the sentences for the predicate felonies could run consecutively to the sentences for first degree murder.

¶ 21     The link between the verdict forms and sentencing is not as clear-cut in the present case. Defendant's argument is that if the jury had been asked to render specific verdicts rather than a general verdict, it might have convicted him of felony murder only and acquitted him of intentional or knowing murder. Had he been acquitted by the jury of intentional or knowing murder, the defendant could not have been found eligible for the death penalty under section 9-1(b)(6), which requires a finding that the defendant either intended to kill the victim or knew that his acts caused a strong probability of death or great bodily harm. 720 ILCS 5/9-1(b)(6) (West 2006). That is, felony murder serves as an eligibility factor only if the murder was committed with intent or knowledge. As a result, use of specific verdict forms could have precluded the application of section 9-1(b)(6). Finally, defendant argues that if he had not been found eligible for the death penalty, he could not have been sentenced to a term of natural life. 730 ILCS 5/5-8-1(a)(1)(b) (West 2006). The proper sentence would have been a term of 20 to 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 2006).

¶ 22     This court anticipated such a situation in *Smith* in its discussion of the "one good count rule" and the use of general verdict forms. After noting that first degree murder is a single offense and that "a general verdict need not rest on a unanimous finding of a particular theory of murder," we observed that "there may be different sentencing consequences based on the specific theory of murder proven." *Smith*, 233 Ill. 2d at 17. We gave the example of the death penalty, where "there are several aggravating factors, applicable only to murders committed intentionally or knowingly," and stated that a defendant convicted of felony murder could not be found eligible for the death penalty under section 9-1(b)(6) unless it were proven that

he not only killed the victim, but also "intended to kill or knew that his acts caused a strong probability of death or great bodily harm." *Id.*

¶ 23 The present case requires us to consider this exact situation, but with the added circumstance that the defendant elected to have the trial court, rather than the jury, determine his eligibility for the death penalty.

¶ 24 The issues raised by the parties require us to address a series of questions: (1) Was defendant found eligible for the death penalty under section 9-1(b)(16) as well as section 9-1(b)(6), thus making the *Smith* question moot? (2) Did the verdict forms requested by defendant implicate *Smith*? (3) Is the rule of *Smith* applicable in the present case where the trial court, not the jury, made the finding of intent or knowledge? and (4) If it was error for the trial court to refuse defendant's request for a specific verdict form for felony murder, what remedy must be given?

¶ 25 As we stated in *Smith*, while decisions regarding jury instructions are generally within the discretion of the trial court, the court must exercise its discretion within the bounds of the law. *Id.* at 15. Because these issues are questions of law, our review is *de novo*. *Id.*

¶ 26 Basis for Finding of Eligibility for Death Penalty

¶ 27 Under the applicable law at the time of defendant's trial, an individual who was convicted of first degree murder was sentenced to a term of "not less than 20 years and not more than 60 years" (730 ILCS 5/5-8-1(a)(1)(a) (West 2006)), unless the "trier of fact [found] beyond a reasonable doubt that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" or any of the aggravating factors listed in section 9-1(b) of the Criminal Code were present, in which case "the court may sentence the defendant to a term of natural life imprisonment" (730 ILCS 5/5-8-1(a)(1)(b) (West 2006)).

¶ 28 Section 9-1(b), at that time, listed 21 aggravating factors under which an individual over the age of 18 who was convicted of first degree murder could be found eligible for the death penalty.[1] The State asserted two of these factors in the present case: (1) that defendant killed the victim in the course of another felony while acting "with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual" and that the other felony was an "inherently violent crime" (720 ILCS 5/9-1(b)(1) (West 2006)); and (2) that "the murdered individual was 60 years of age or older and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty" (720 ILCS 5/9-1(b)(16) (West 2006)).

¶ 29 Thus, if defendant in the present case was properly found eligible for the death penalty under section 9-1(b)(16) of the Criminal Code, based on the victim's age and the brutal nature of the crime, the natural life sentence imposed by the trial court is proper because the requested special verdict forms could not have resulted in a verdict that would have negated such a finding.

---

[1]The death penalty was abolished in Illinois by Public Act 96-1543, § 10, effective July 1, 2011, codified at 725 ILCS 5/119-1 (West 2010).

¶ 30 The State argues that although the trial court at the eligibility hearing did not expressly state that the murder was exceptionally brutal and heinous, the trial court "necessarily made this finding" based on its statement that the State had proven the existence of "aggravating factors," plural, rather than "an aggravating factor," singular. The State goes on to recount the details of the crime, arguing that the evidence was sufficient for such a finding, concluding that the "viciousness, brutality and cruelty of this murder cannot be overstated."

¶ 31 While we acknowledge defendant's violent and cruel betrayal of an elderly gentleman who had befriended him and that the evidence might indeed have supported such a conclusion, we are not reviewing a finding of fact under the standard for sufficiency of the evidence. See *People v. Evans*, 209 Ill. 2d 194, 209 (2004) (when reviewing a challenge to the sufficiency of the evidence, a reviewing court considers whether the evidence is so improbable, unsatisfactory, or inconclusive that it creates reasonable doubt of the defendant's guilt). We are reviewing the record to determine whether the trial court, as the trier of fact at the eligibility stage, actually found that "the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty," making defendant eligible for the death penalty.

¶ 32 We find nothing in the record to support such a conclusion. The words "brutal," "heinous," and "cruelty" were not spoken at the eligibility hearing. After asking the court to take judicial notice of the verdicts, the State's entire argument consisted of a statement that "the defendant qualifies for the death penalty based upon the fact that he had reached the age of 18 at the time of the offenses and he was convicted of offenses that would make him death eligible." In announcing its findings, the trial court stated that it "finds beyond a reasonable doubt that the defendant was 18 years of age or older at the time of the murder for which he was convicted in this case, and finds beyond a reasonable doubt that the statutory factors do exist and that the murder was committed during the course of the felonies, being home invasion and robbery."

¶ 33 Clearly, by noting the "offenses" that defendant committed, both the State and the trial court were referring to the predicate felonies of home invasion and robbery that implicated the felony-murder aggravating factor, section 9-1(b)(6).

¶ 34 The State also emphasizes the court's use of the plural "factors," but this word choice is likely a reference to the two predicate felonies, both of which the trial court specifically mentioned. When such enormous consequences would flow from such a finding, we will not infer a finding of brutal and heinous conduct from the mere fact that the trial court used the plural "factors."

¶ 35 We conclude that the record does not support the State's assertion that the trial court found defendant eligible for the death penalty under section 9-1(b)(16). Further, we will not accept the State's invitation to engage in our own assessment of the facts to determine whether a natural life sentence is proper under section 5-8-1(1)(b) of the Code of Corrections because "the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty." This is not the proper role of a reviewing court.

¶ 36 Thus, defendant was properly sentenced to a term of natural life under section 5-8-1(1)(b) of the Code of Corrections only if he was properly found eligible for the death penalty under

section 9-1(b)(6) of the Criminal Code.

¶ 37                        Requested Verdict Forms

¶ 38        The State argues that even if the requested felony-murder verdict form had been given, the resulting verdict would not have clarified whether the jury found defendant guilty of felony murder alone or felony murder in addition to intentional or knowing murder. The State points to defendant's lack of objection to the use of pattern verdict forms 26.05, "Guilty of First Degree Murder," and 26.02, "Not Guilty of First Degree Murder." In fact, the State asserts, defendant expressly requested that the felony-murder forms be given "as well as" these two forms. Thus, the jury would not have been given the option to specifically acquit him of intentional or knowing murder. In effect, the State's position is that defendant has not properly preserved this issue for appeal because he did not request verdict forms for each of the three forms of first degree murder.

¶ 39        Defendant responds that because his request for a separate felony-murder verdict form was denied, the trial court most certainly would have denied a request for specific verdict forms dealing with intent and knowledge as well. Defendant also notes that in *Smith*, defendant Smith asked for separate verdict forms only for the felony-murder counts (*Smith*, 233 Ill. 2d at 8-9), while defendant Titus asked for "separate verdict forms for each of the counts of murder charged" (*id.* at 13). This court did not distinguish between the two defendants, but rather found error in both cases.

¶ 40        Our review of the record reveals that defense counsel replied "No objection" when asked whether he objected to the "manner and form" of the general verdict forms presented by the State. Immediately thereafter, defense counsel referred to a previous discussion "in chambers" regarding verdict forms. His attempt to explain the request for separate verdict forms was interrupted by the trial court's asking if the State wished to respond. The State objected "to breaking it down to different types of murder," and the trial court denied defendant's request.

¶ 41        We note that the appellate court did not discuss this question, perhaps because the State is raising it here for the first time. In any event, we are not inclined to find the issue forfeited based on the record before us. The trial court's apparent refusal to utilize a separate felony-murder verdict form at an earlier "in chambers" meeting foreclosed all discussion of what other verdict forms would have been appropriate. The defendant's request on the record for a separate verdict form was clearly intended to document a ruling that had already been made. Thus, we conclude that the defendant's request to have the jury instructed on and given separate verdict forms for each of the different mental states is sufficiently documented to preserve this issue on appeal.


¶ 42              Applicability of *Smith* When the Trial Court Determines
                          Eligibility for the Death Penalty

¶ 43        Under this court's decision in *Smith*, if a jury finding of not guilty on counts of intentional or knowing murder would have sentencing consequences for the defendant

convicted of felony murder, he is entitled to separate verdict forms upon request. *Id.* at 23.

¶ 44 The State argues that the rule of *Smith* does not apply in the present case because the trial court, not the jury, was determining eligibility for the death penalty and was entitled to make its own assessment of the facts. The State asserts that because the eligibility phase of a capital sentencing hearing is independent of the guilt phase and because the defendant's waiver of a jury for the eligibility phase made the trial court the independent finder of fact, the trial court's consideration of defendant's mental state is not limited by the jury's verdict, citing *People v. Shatner*, 174 Ill. 2d 133, 149-51 (1996) (trial court properly found defendant eligible for death penalty where general verdict of guilty of first degree murder encompassed necessary finding of intent and sentencing judge heard the overwhelming evidence at trial). The remainder of the State's discussion of this issue relates to the proper remedy for a *Smith* error, not to whether an error actually occurred.

¶ 45 Defendant squarely presents the question that frames the issue under *Smith*: *If* the jury had been given separate verdict forms as he requested *and if* the jury had found him not guilty of intentional and knowing murder, could the trial court have made a finding of intent or knowledge under section 9-1(b)(6)? He argues that the trial court could not have made a factual finding at the eligibility stage that was directly contrary to a jury verdict of acquittal. Thus, he asserts, the exact nature of the error was that the general verdict form failed to reveal whether he was acquitted of intentional or knowing murder, which would have foreclosed application of section 9-1(b)(6). He points to *Beck v. Alabama*, 447 U.S. 625 (1980), and *Bullington v. Missouri*, 451 U.S. 430 (1981), in support of his position.

¶ 46 In *Beck*, the defendant was convicted of murder committed during the course of a robbery and was sentenced to death. Under Alabama law at that time, felony murder was a lesser-included offense of the capital crime of "robbery-intentional killing." *Beck*, 447 U.S. at 628. In addition, the death sentence was mandatory upon conviction of a capital offense unless the court refused to impose it based on mitigating circumstances, in which case the defendant was sentenced to life in prison without the possibility of parole. *Id.* at 629. State law also prohibited the giving of a jury instruction on a lesser-included offense in a capital trial. Thus, the jury had only two options—convict the defendant of capital murder or let him walk free. *Id.* at 628-29. State law totally foreclosed the possibility of convicting the defendant of a lesser offense and imposing a lesser sentence.

¶ 47 The Supreme Court held that the death penalty could not be imposed under these circumstances. *Id.* at 628. Specifically:

> "[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake." *Id.* at 637.

¶ 48 *Beck* does not dictate the result in the present case because, in Illinois, felony murder is not a lesser-included offense of first degree murder. As we noted in *Smith*, while our statute

describes three "types" of murder, first degree murder is a single offense. *Smith*, 233 Ill. 2d at 16. The three theories, each of which requires a mental state or conduct that must accompany the act that causes the death of the victim, merely describe different ways to commit the crime of first degree murder. *Id.* Thus, it is constitutionally permissible for jurors to return a general verdict of guilty even if there is no juror unanimity with regard to the means by which the murder was committed or the mental state of the killer. *Id.* (citing *Schad v. Arizona*, 501 U.S. 624, 631-32 (1991)).

¶ 49　　Further, *Beck* does not require a separate jury instruction or verdict form upon request by a defendant. See, *e.g.*, *People v. Tenner*, 157 Ill. 2d 341, 373-74 (1993) (distinguishing *Beck v. Alabama* and holding that defendant's tendered instructions on second degree murder were properly refused because they were not supported by the evidence). Indeed, the Supreme Court later explained its holding in *Beck*, saying that "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction. The jury's discretion is thus channelled so that it may convict a defendant of any crime fairly supported by the evidence." (Emphasis in original.) *Hopper v. Evans*, 456 U.S. 605, 611 (1982).

¶ 50　　*Tenner* and *Hopper* do not make *Beck* irrelevant to our analysis. While it may be unlikely, given the cause and manner of the victim's death and defendant's confession, that the jury would have acquitted defendant of intentional or knowing murder, we cannot say that a jury could not have found defendant guilty of felony murder only.

¶ 51　　*Beck* is instructive on the point raised by defendant. As in *Beck*, the lack of a separate jury instruction on felony murder made it impossible for the jury in the present case to utilize the "third option" (*Beck*, 447 U.S. at 637) of acquitting defendant of intentional or knowing murder while convicting him of felony murder. We find the reasoning of *Beck* persuasive that a defendant's request for separate instructions and verdict forms on felony murder should be provided when their presence could affect the defendant's eligibility for the death penalty and for a life sentence if death is not imposed.

¶ 52　　Defendant also relies on *Bullington*, in which the Supreme Court held that the State could not seek the death penalty in a retrial after the jury in the first trial rejected the death penalty. In Missouri, proceedings in a capital case were bifurcated into a guilt phase and a sentencing phase, with the same jury at both stages. *Bullington*, 451 U.S. at 433-34. The defendant was found guilty of capital murder and a sentencing hearing was held the next day. *Id.* at 435. The jury rejected the death penalty and fixed defendant's sentence at life imprisonment without eligibility for parole for 50 years. *Id.* at 435-36. Thereafter, the conviction was reversed on grounds related to jury selection. *Id.* The State announced its intent to again seek the death penalty and the trial court granted the defendant's motion to strike. *Id.* In an interlocutory appeal, the Missouri Supreme Court, in a divided opinion, held that allowing the prosecution to seek the death penalty at a second trial did not violate the double jeopardy clause, the eighth amendment, or due process, and would not chill a defendant's effort to seek a new trial based on constitutional violations at his first trial. *Id.* at 437 (citing *State ex rel. Westfall v. Mason*, 594 S.W.2d 908 (1980)).

¶ 53　　The Supreme Court reversed on the grounds that the sentence of life imprisonment

-10-

imposed by the jury in the first trial meant that " 'the jury has already acquitted the defendant of whatever was necessary to impose the death sentence.' " *Id.* at 445 (quoting *Westfall*, 594 S.W.2d at 922 (Bardgett, C.J., dissenting)). Allowing the State to seek the death penalty under these circumstances would violate the prohibition against double jeopardy, because "[h]aving received 'one fair opportunity to offer whatever proof it could assemble,' [citation] the State is not entitled to another." *Bullington*, 451 U.S. at 446 (quoting *Burks v. United States*, 437 U.S. 1, 16 (1978)).

¶ 54    Again, *Bullington* does not directly address the question in the present case because the procedural postures of the two cases are different. It does, however, stand for the proposition that once a jury has acquitted a defendant of an offense, an element of which is necessary to the imposition of the death penalty, a subsequent fact finder—whether judge or jury—may not make a contradictory finding. *Id.*

¶ 55    These cases, taken together with our holding in *Smith*, suggest that if a jury in a capital case has rendered a verdict in the guilt phase that contradicts a fact necessary for a finding of eligibility at the sentencing phase, a contradictory finding cannot be made. For example, if a jury were given separate verdict forms for intentional and knowing murder and felony murder and were to find the defendant guilty of knowing murder, but not guilty of felony murder and the predicate felony, the State could not thereafter assert section 9-1(b)(6) as a basis for death eligibility. This would be true whether the jury or the trial court was making the eligibility determination. Once acquitted of felony murder and the charged predicate felony, the defendant could be found death-eligible under one of the other eligibility factors, but application of section 9-1(b)(6) would be absolutely foreclosed.

¶ 56    Similarly, in the present case, if the jury had been given separate verdict forms and had acquitted defendant of intentional or knowing murder, application of section 9-1(b)(6) would have been foreclosed because the verdict would have negated an essential element of this eligibility factor. The State's argument that the factual determinations made during the guilt phase and the eligibility phase are "mutually exclusive" is mistaken and is inconsistent with Supreme Court precedent.

¶ 57    We, therefore, agree with the appellate court that the trial court erred by refusing to provide the jury with separate verdict forms upon request where a general verdict would make it impossible to determine whether the jury acquitted defendant of intentional or knowing murder, when that determination had sentencing consequences for the defendant. We reaffirm our holding in *Smith* that "where, as here, specific findings by the jury with regard to the offenses charged could result in different sentencing consequences, favorable to the defendant, specific verdict forms must be provided upon request and the failure to provide them is an abuse of discretion." *Smith*, 233 Ill. 2d at 23.

¶ 58    Having reached this conclusion, we acknowledge the State's concern with the effect this holding might have on the body of law governing general verdicts of guilty of first degree murder. If separate verdict forms are used, it is possible that 12 jurors may find the defendant guilty of murder, but they may be divided on the specific theory of murder. We leave for another day the question of how such a divided verdict should be treated. However, it remains true that first degree murder is a single offense and that a conviction of this offense

"need not rest on a unanimous finding of a particular theory of murder." *Smith*, 233 Ill. 2d at 17. It is also true that the issue raised in the present case will not recur because Illinois no longer has the death penalty. Thus, application of *Smith* in future cases would seem to be limited to the question of consecutive or concurrent sentencing for charged predicate felonies.

¶ 59                                    Remedy for *Smith* Violation

¶ 60    Having found error in *Smith*, this court considered whether such an error may be deemed harmless. *Id.* at 25. We concluded that this question cannot be resolved by considering whether the evidence was sufficient to support a guilty verdict for intentional or knowing murder. Rather, the error is harmless "only if the jury's findings may be ascertained from the general verdicts entered." *Id.*

¶ 61    In the present case, although the evidence may have been sufficient to support a verdict of intentional or knowing murder, the general verdict of guilty of first degree murder does not reveal whether the jury actually found defendant guilty of intentional or knowing murder or only of felony murder. Specific verdict forms would have made the jury's factual findings clear. Therefore, the error was not harmless and it may not be presumed that the jury convicted defendant of intentional or knowing murder. *Id.* at 27-28. In such a case, "the appropriate remedy is to interpret the general verdict as a finding on felony murder" and to impose sentence accordingly. *Id.* at 28.

¶ 62    The appellate court concluded that the "trial court's decision to sentence defendant Bailey to natural life imprisonment for felony murder was proper," because the "evidence supported a finding beyond a reasonable doubt that, while committing the offense of home invasion, defendant Bailey acted with intent to kill *** or knew that his actions *** created a strong probability of death or great bodily harm." 2011 IL App (1st) 090074-U, ¶ 41. In reaching this conclusion, the appellate court applied the standard that the trial court's decision to impose a life sentence will not be disturbed unless "the evidence is so unreasonable, improbable or unsatisfactory that it does not provide proof of the findings beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* (quoting *People v. Reed*, 405 Ill. App. 3d 279, 287 (2010)).

¶ 63    As noted above, however, the applicable standard is not whether the evidence was sufficient to support a finding of intentional or knowing murder had the jury been given verdict forms that directly presented that question. The standard under *Smith* is whether the sentence imposed by the trial court can stand when the general verdict is interpreted as a finding on felony murder and sentence is imposed accordingly. *Smith*, 233 Ill. 2d at 28.

¶ 64    Because we find error under *Smith* and because *Smith*, when read in conjunction with *Beck* and *Bullington*, requires that the verdict be interpreted not only as a conviction of felony murder, but also as an acquittal of intentional or knowing murder, the appellate court's analysis is flawed. When the general verdict is viewed, as it must be, as an acquittal on the counts of intentional and knowing murder, the trial court's finding of eligibility for the death sentence cannot stand, despite the evidence that might have supported such a finding. Simply stated, the trial court was foreclosed from making its own determination of defendant's

mental state because the *Smith* error requires that the general verdict of guilty of first degree murder be treated as a verdict of guilty of felony murder and an acquittal of intentional or knowing murder. As a result, the State was barred from seeking a finding of eligibility under section 9-1(b)(6).

¶ 65    Thus, because defendant was not properly found eligible for the death penalty, he was not eligible for a sentence of natural life without parole under section 5-8-1(b) (730 ILCS 5/5-8-1(a)(1)(b) (West 2006)), which may be imposed when the court elects not to impose the death penalty on a death-eligible defendant. The proper sentencing range for a defendant convicted of felony murder but acquitted of intentional or knowing murder is 20 to 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 2006).

¶ 66    We are not persuaded by the State's arguments to the contrary. The State asserts, without citation to authority, that this court "has expressly held that even where a defendant is only charged with felony murder *** and not intentional or knowing murder *** he may still be found eligible for the death penalty." This may be true. When Illinois still had the death penalty, an individual might have been charged with felony murder only and convicted of that crime and the State might have thereafter presented evidence of intent at the eligibility phase. In such a case, the absence of a conviction of intentional murder would not have barred such a finding at the eligibility stage. However, a previous acquittal of intentional murder would have foreclosed that possibility. In the present case, the jury's verdict must be interpreted as an acquittal of intentional or knowing murder. *Smith*, 233 Ill. 2d at 28.

¶ 67    The State also argues that defendant has already received the remedy set forth in *Smith* because the trial court imposed the sentences for the predicate felonies concurrent to the life sentence. This is indeed the remedy applied in *Smith*, but it is an incomplete remedy in the present case because the lack of separate verdict forms not only affected the sentencing on the predicate felonies, but also the determination of eligibility for the death penalty, which, in turn, made the defendant eligible for a life sentence.

¶ 68    In addition, the State argues that *Smith* requires only that the general verdict be interpreted as a guilty verdict on the felony-murder count, not that it be interpreted as an acquittal of the intentional and knowing murder counts. We have already rejected this argument as inconsistent with the Supreme Court's holdings in *Beck* and *Bullington* and with this court's reasoning in *Smith*.

¶ 69    The State characterizes this as a repudiation of the "one good count rule," which we reaffirmed in *Smith*. See *id*. at 15-21. While our decisions in *Smith* and the present case may result in the "one good count rule" being applied less frequently, we do not repudiate the rule. The rule is applicable in a case where a general verdict of guilty has been properly rendered. The rule of *Smith* applies only where the defendant has requested separate verdict forms, where the lack of separate verdict forms could have adverse sentencing consequences, and where the trial court denies the defendant's request.

¶ 70                                    CONCLUSION

¶ 71    We, therefore, hold that the trial court erred by denying defendant's request for separate verdict forms and the proper remedy for this error is to vacate the defendant's sentence of life

imprisonment and to remand to the trial court for sentencing pursuant to section 5-8-1(a) (730 ILCS 5/5-8-1(a) (West 2006)). As a result, it is unnecessary to reach defendant's claims of collateral estoppel or double jeopardy.

¶ 72       For the reasons stated, that part of the appellate court's judgment which affirmed defendant's natural life sentence is reversed, the circuit court's sentence of natural life is vacated, and the cause is remanded to the circuit court for further proceedings.

¶ 73       Appellate court judgment reversed in part.

¶ 74       Circuit court judgment vacated in part.

¶ 75       Cause remanded.