2016 IL App (1st) 143422

FIRST DIVISION
June 13, 2016

No. 1-14-3422

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 19295 |
| | ) | |
| WILLIE COLLINS, | ) | Honorable |
| | ) | Luciano Panici, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Cunningham and Justice Connors concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Willie Collins, appeals his convictions after a jury trial of aggravated battery with a firearm and attempted armed robbery. On appeal, defendant contends the trial court erred by (1) refusing to present the jury with an instruction on the affirmative defense of compulsion; and (2) precluding the testimony of witness Taylor Chapman as hearsay. For the following reasons, we affirm.

¶ 2                                JURISDICTION

¶ 3    The trial court sentenced defendant on September 19, 2014. He filed a notice of appeal on October 16, 2014. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

¶ 4                                    BACKGROUND

¶ 5      Defendant, along with two codefendants who are not parties to this appeal, was charged with attempted first degree murder, aggravated battery with a firearm, attempted armed robbery, aggravated discharge of a firearm, and aggravated battery, in connection with an incident that occurred on September 29, 2010. Defendant and his codefendants had separate trials with separate juries.

¶ 6      At defendant's trial, Amir Muhammed Azhar testified that on September 29, 2010, he was working alone at the Marathon gas station at 711 South Halsted Street in Chicago Heights, Illinois. Around 8:15 p.m. that evening, Amir was at the cash register in the store behind a bulletproof glass window that could only be opened by the cashier. Defendant entered the store and asked for a single cigarette. Keeping the bullet-proof glass window closed, Amir gave defendant a cigarette through a drawer in the window. Defendant then asked Amir to light the cigarette for him. To do so, Amir opened the bulletproof window. Defendant conversed with Amir and Amir tried to close the window. Defendant, however, "kept asking [him] about things which are behind the counter" and Amir kept the window open so he could answer defendant's questions.

¶ 7      Another person, later identified as codefendant DeAnthony Pearson, entered the store. Amir noted that he had his face covered except his eyes, and he had a gun in his hand. Amir tried to close the bulletproof window, but Pearson put his hand on the window so it would not close. Amir saw that defendant was still in the store and when Pearson was about 1½ feet away he shot Amir. Amir fell and used his cell phone to call 911. He soon lost consciousness and awoke three days later in the hospital. A surveillance camera recorded the events in the store and the video was entered into evidence.

¶ 8    Keiara Boyd testified that in September 2010 she was dating and living with codefendant Armoni Allen. Defendant lived across the street and would visit their house "[e]very now and then." Keiara also knew codefendant Pearson. On September 29, 2010, around 8 p.m., defendant, Pearson and Allen were at Allen's residence. Keiara noticed that Pearson had a gun and he was "playing with it." When she told him she "didn't play with guns" he stopped pointing it at her. Keiara and Allen then went upstairs and while they were upstairs, Keiara heard Pearson yell for Allen to "come on." Allen then left the room and he, Pearson and defendant left the house together.

¶ 9    Approximately 5 to 10 minutes later, Allen returned alone but was soon joined at the house by defendant and Pearson. Everyone was in the same room and Pearson, who had the gun in his hands, stated that he shot someone but he did not "know where he shot the man." Allen told defendant and Pearson to leave, and when they left Pearson left the gun in the room. Keiara noticed the gun and told Allen to tell Pearson to take the gun with him. Pearson returned and took the gun with him. Keiara testified that every time she saw Pearson that day, he had a gun but she never saw him point the gun at defendant. After defendant and Pearson left the house, Allen received a call from Pearson telling him to look out his back window toward the Marathon gas station and he looked out the window.

¶ 10    Detective Stepich testified that he responded to a shooting at the Marathon gas station on 711 South Halsted Street on September 29, 2010, around 8:20 p.m. He recovered surveillance video and followed up on a 911 call that was made by a witness. Detective Stepich learned that defendant was the person who made the 911 call and defendant was brought in for questioning. After reviewing the surveillance video, Detective Stepich believed defendant was involved in the crime based on the footage. Detective Stepich testified that in viewing the footage, he saw that

defendant "was in the store, he got the victim to open up the bulletproof glass window. He stuck his hand through the opening a few times, it appeared, and they got–the gentleman wasn't trying to close it, but it seemed like he was trying to keep the window open when the shooter and the other suspect came inside, and he shot, and he fell on the ground." The footage showed that after the shooting, the codefendants ran but defendant "went outside, picked up a cigarette, and was standing outside smoking a cigarette, and eventually he just walked away from the scene."

¶ 11    Detective Stepich read defendant his *Miranda* rights and defendant agreed to speak. Defendant stated that he, Pearson and Allen planned to rob the gas station and "his job was to go inside and get the gas station attendant to open the bulletproof glass window." Defendant would be on the cell phone with Pearson and Allen and when he used the code word "condom," that was his signal the window was open and they could come in for the robbery. In the gas station, while on the phone with Allen, defendant asked for a cigarette and then he asked for a light. When told he could not smoke in the store, defendant went outside and put the cigarette on the ground. He then came back inside and asked the gas station attendant some questions and asked about the condoms. After he said the word, Pearson and Allen came into the store and defendant was pushed to the ground. Defendant stated that this was part of the plan, "to act like he had fell to the ground." Pearson and Allen approached the gas station attendant; Pearson shot him and then he and Allen ran from the gas station. Defendant went outside to get his cigarette, returned and asked the gas station attendant if he was alright, then left the scene. Defendant stated that he called 911 and then went back to Allen's house to meet up with Pearson and Allen. He returned the phone he had used during the incident.

¶ 12    After speaking with defendant, Detective Stepich went to Allen's house and arrested Allen. He then went to Pearson's residence and was given permission to search the house. He

recovered a pair of shoes that appeared to be the ones worn by one of the offenders in the video and a green cell phone that defendant appeared to be holding at the gas station. After a search warrant was issued on Allen's house, Detective Stepich recovered a black Hi-Point 9-millimeter semiautomatic handgun and clothing that appeared to be clothes worn by the shooter when he entered the store.

¶ 13    Detective Murtagh was assigned to investigate the shooting and he watched the video surveillance tape recovered at the gas station. Detective Deel processed the crime scene, taking fingerprints from the bulletproof glass window and recovering discharged cartridge casings. Detective Murtagh received this evidence for processing. Officer Estock took fingerprints of defendant, Allen and Pearson. Karen Heard, an expert in fingerprint identification, determined that the fingerprints found on the bulletproof glass window matched those taken from Pearson. Jeffrey Parise, an expert in the field of firearm identification, determined that both the fired cartridge case and discharged cartridge came from the recovered handgun.

¶ 14    Assistant State's Attorney (ASA) Farah Brass interviewed defendant on September 30, 2010. He agreed to speak with her and she took a handwritten statement in which defendant detailed the circumstances of the shooting as he had told Detective Stepich earlier. ASA Brass testified that during his interview, defendant never mentioned that Pearson or Allen threatened him or his family in any way. ASA Brass informed defendant that she would be speaking with his codefendants and "he seemed to be okay with that." Defendant told ASA Brass that Pearson allowed him to borrow a phone because defendant's phone could not make outgoing calls.

¶ 15    Dr. David McElmeel treated Amir at Christ Hospital for multiple gunshot wounds. He stated that when he arrived at the hospital, Amir was not conscious or breathing on his own. A gunshot wound to Amir's upper chest area caused injuries to his right lung, bronchial arteries,

and lower rib. He also suffered a gunshot wound in his right arm. Dr. McElmeel stated that if he had not received the emergency surgery Amir would have died.

¶ 16    The State rested and defendant called Taylor Chapman, defendant's cousin, as a witness. Taylor testified that on September 29, 2010, between 7 p.m. and 7:45 p.m., she and her friend Alexis were walking home from school. As they were walking in the alley they saw defendant, followed by Pearson who had his hand in his pocket. Defendant and Pearson walked into Allen's garage. She saw Allen there and defendant "looked scared." Pearson took out his gun and Taylor heard a "little click" from the loaded weapon. He started waving the gun around and then he put the gun to Taylor's head, grabbing her ponytail. He then took the gun and after saying some words, placed the gun on Alexis's abdominal area. Pearson next "placed the gun on" defendant. Afterwards, Taylor and Alexis left. Taylor testified that she tried to call her mother at work but was unable to speak with her. After her mother got off of work, they went to the police station but the people at the front desk told them to come back the next day. When they returned, the police informed them it was too late to file a police report because charges had been filed against defendant.

¶ 17    On cross-examination, Taylor stated that Pearson "made several threats." Taylor could not describe the officer behind the front desk who talked to her and her mother. She stated that the first time they spoke to defendant's attorney about the incident in the garage was a week before trial.

¶ 18    Alexis Pratt testified that on September 29, 2010, she was coming home from school with Taylor and arrived at her house around 4 p.m. An hour later, they left her house and went to Taylor's house. As they were walking, they saw defendant and Pearson going into Allen's garage. Taylor tried to get defendant to come out, but Pearson "had a gun and started playing

with it," putting it to defendant's chest. Pearson loaded and unloaded the gun and he waved it around. After putting the gun to defendant's chest, Pearson put the gun "towards [Taylor's] head and held her ponytail." He then pointed the weapon at Alexis, toward her vagina. Alexis stated that Pearson made threats to her, defendant and Taylor. Alexis and Taylor went to the police station with Taylor's grandmother. The police told them to come back in the morning to make a statement. When they returned the next morning, the police told them that defendant had been charged and it was "too late."

¶ 19    Renee Johnson, defendant's grandmother and guardian, testified that on November 16, 2010, she saw Allen's mother with Keiara Boyd at one of defendant's court dates. Keiara told her that defendant did not want to participate in the crime but Pearson "forced him." Ms. Johnson stated that after she returned home from work on September 29, 2010, she went to the police station with Taylor and Alexis. She testified that she was not allowed to file a police report until the following day, but when she returned she was told it was too late because defendant had "already been processed."

¶ 20    Defendant testified in his defense. He stated that on September 29, 2010, he was 18 years old and after school he stopped by the Marathon gas station to buy cigarettes. When he crossed the street toward the gas station, Pearson came out of the alley and waved at him to come over. Pearson told defendant that he "wanted to talk for a second" but was being a little assertive. Pearson asked defendant questions about the gas station attendant and if he knew how often the bulletproof glass window in the gas station was opened. Defendant responded that he did not know and that "[a]ll I know is that I need to get home." As defendant started to walk away, Pearson touched his shoulder and said "come on, let's go to [Allen's] house for a second." He put his arm around defendant's shoulder and they took the alley to Allen's house.

¶ 21    As they approached Allen's garage, Pearson no longer had his hand on defendant's shoulder and was "a little bit in back of" defendant. He saw Taylor and Alexis coming up the alley but he "didn't pay no attention" and "kept going toward the garage." Allen was in the garage. Pearson kept asking defendant questions about the gas station and defendant "started getting annoyed" and wanted to leave. At that point, Pearson reached into his hoodie pouch and pulled out a black gun. Defendant "got a little bit panicky" and stepped back. Pearson told defendant that "all I need you to do is go into the gas station and get him to open up the gas station window" so they could commit the robbery.

¶ 22    Defendant heard Taylor ask him what he was doing in the garage, and Pearson pointed the gun toward defendant's chest. Pearson and Taylor got into an argument and Pearson stated, "Bitch, mind your own business. This ain't got nothing to do with you. This is between me and baby Willie. So what you need to do is leave, leave this garage and go home." Pearson pulled on Taylor's braids and pointed the gun toward her head. Taylor and Alexis did not leave and Alexis told Pearson to take his hands off of Taylor. Pearson then pointed the gun toward Alexis's groin area. Pearson told Alexis that if she did not "mind [her] fucking business," he would make "another piss hole to piss out of." Pearson then took the gun off of Alexis and pointed it at defendant's chest. Pearson stated "I don't need you all no more. I got who I need to do what I need to do." Taylor turned to leave but she told defendant that he should "go home."

¶ 23    Pearson pushed defendant toward the house. He told defendant that "[e]ither you are going to do this or something can happen." Pearson asked defendant for information about when the gas station attendant opened the bulletproof window. Defendant told him that sometimes they open it for people who purchase cigarettes. Allen got up to go into his house and Pearson pushed defendant toward the door and told him to follow Allen. They stayed in Allen's kitchen for about

30 minutes and during that time Pearson's hands were on the kitchen counter, "but the gun is just literally sitting in front of him."

¶ 24    Someone came to the door and defendant heard a voice say "get that damn gun out of my face." Keiara then came into the kitchen followed by Pearson. She asked what was going on and Allen told her to go upstairs. Allen pulled Pearson to the side and they discussed their plan. Pearson had his gun in the pouch of his hoodie. Allen went upstairs and Pearson was pacing back and forth, talking to himself. He stopped and yelled to Allen to "[b]ring your ass on." Allen came downstairs and they all went into the garage. Pearson told defendant that when he gets in front of the Marathon gas station to give him and Allen a call. Defendant told Pearson that his phone could only call 911 so Pearson gave him his phone.

¶ 25    They tried a test run to the Marathon gas station and Pearson followed defendant with his gun in his pouch. Defendant entered the store and asked for a cigarette. Amir slid it under the glass window and when defendant asked for a light, Amir opened the window and lit the cigarette for him. Pearson waited outside the store and after defendant exited they walked back to Allen's garage. Allen was in the garage and Pearson stated that it had gone well and to "get ready." They went back inside Allen's house and Pearson and Allen changed clothes. Defendant testified that while they changed, Pearson's gun was on the kitchen island.

¶ 26    After they changed, Pearson told defendant what route he should take to the gas station and instructed him to call them when he got to the gas station parking lot. Pearson and Allen were going to "stay in the alleyway, because the alleyway can look over all three buildings. You have the Starship Video, the pub, the Marathon gas station." Defendant "walked down Southgate, turned that left on Halsted, and walked toward the Marathon gas station." When he

got to the gas station parking lot, he called them and said, "I'm in front of it." He then saw Allen and Pearson behind a fence.

¶ 27    Defendant entered the store and told them that no one was in the store at that time. He asked Amir for a cigarette. Amir slid the cigarette under the glass and when defendant asked for a light, Amir opened the glass window. When it was open, defendant said the word "condom" which was the code word for Allen and Pearson to come into the store. As part of the plan, Allen and Pearson pushed defendant down using a "little more force than what they said it was going to be." Defendant could not see what was happening. He heard someone repeatedly tell Amir to "give me the money" and Amir responded, "no, no." Defendant heard a gunshot and his "vision went black and [his] ears started ringing." He got up and went to the counter. He saw Amir's legs "sticking out" and he asked if Amir was "all right." He heard "mumbling and grumbling" from Amir and was going to call 911 but then he received a call from Allen asking where he was. When he told Allen that he was still at the gas station, Allen told him to "[h]urry the fuck up."

¶ 28    Defendant panicked, walked out of the store and picked up his cigarette. He called 911 to report the shooting and then started walking toward Allen's house. Pearson came up to him and asked what had taken defendant so long and whether Amir had been shot. Defendant told Pearson that he did not know and Pearson "got a little more frustrated." Pearson grabbed defendant and asked him to return his phone. When they returned to Allen's house, Allen asked defendant what had taken him so long and Pearson pushed defendant into the kitchen. In the house, Pearson stated that he had shot Amir. Pearson still had the weapon while they were in Allen's house. Pearson and defendant went upstairs to speak with Allen and when defendant tried to go back downstairs Pearson grabbed him and told him to wait. Pearson then led defendant to the kitchen. Allen called for Pearson and Pearson told defendant to follow him back

upstairs. At that point, Allen returned Pearson's gun to him. Defendant told Pearson he was leaving the house and shortly thereafter he received a call from the 911 operator. He gave his name and address and agreed to speak to the police about the incident. Defendant acknowledged that he voluntarily gave a statement to the police and to the ASA.

¶ 29    On cross-examination, defendant stated that although he had gone to school with Pearson, they were not friends. Defendant was a senior and Pearson was a freshman in high school so they did not have any classes together. He called Pearson by the nickname, "D." Although he did not feel threatened when Pearson first spoke to him that day, Pearson became more agitated when asking defendant about the gas station, and defendant became scared. Defendant stated that Pearson threatened Taylor by telling her to "mind her own fucking business or she going to get hurt." Pearson also threatened defendant by telling him that "he was going to knock a patch" in defendant's head, which was slang for putting a bullet in his head. Pearson, however, did not point the gun at defendant's head and when they went into Allen's house, Pearson put the gun on the kitchen island near where defendant stood. Defendant acknowledged that he walked to the gas station alone, taking a different route from Pearson and Allen. On the way, he did not always see Pearson or Allen. Defendant also testified that he was not always in communication with them by cell phone on his way to the gas station. He stated that while walking to the gas station, he passed the Starship Video building and the pub. Defendant acknowledged that when he passed those buildings he could not see Pearson or Allen walking down the alleyway. He stated that he could see them, however, when he passed by the gap between the buildings. Defendant never alerted anyone inside the buildings that he was being forced to participate in an attempted robbery. When he first entered the gas station parking lot, Pearson and Allen were not there. He did not ask Amir to call 911 or signal for him not to open the bulletproof glass window.

Defendant also acknowledged that he did not tell the 911 operator that he had been threatened, and that he did not claim in his statements that he was threatened with a gun. Defendant stated that he did tell Detective Stepich that he was threatened. He testified that the only time Pearson threatened him was in Allen's garage, hours before the actual shooting. In rebuttal, Detective Stepich testified, over defendant's objection, that defendant never told him he was threatened.

¶ 30    The defense rested and requested an instruction on the affirmative defense of compulsion. The trial court denied the request, finding that "[t]he threat subsided when [defendant] walked out. He could have gone out–he had two phones. He had the green phone, which could have called anybody. He could have called the [P]resident of the United States, if he wanted to, or he could have called 911 on his own phone when he was away from them. He didn't do that." It found that the threat of future injury in this case was "not sufficient to excuse criminal conduct" and that defendant "had a number of ample opportunities to withdraw from the criminal enterprise and he failed to take steps in that direction. That is the key. He failed to withdraw."

¶ 31    After closing arguments, the jury found defendant guilty of attempted armed robbery and aggravated battery with a firearm, but not guilty of attempted first degree murder. Defendant filed a motion for a new trial, contending as error the trial court's refusal to instruct the jury on the compulsion defense. The trial court denied the motion, finding that the evidence established defendant had "ample opportunity to withdraw" but he did not do so. Defendant was sentenced to 20 years imprisonment for aggravated battery with a firearm, and a consecutive 10 years for attempted armed robbery. Defendant filed this timely appeal.

¶ 32                          ANALYSIS

¶ 33    Defendant contends that the trial court erred when it denied his request to instruct the jury on the affirmative defense of compulsion. Defendant is entitled to an instruction where some

evidence exists to support the giving of the instruction. *People v. Jones*, 219 Ill. 2d 1, 31 (2006). The trial court should not give instructions which are not supported by evidence in the record. *People v. Mohr*, 228 Ill. 2d 53, 66 (2008). We note that the standard of review regarding whether evidence exists to support a jury instruction is unclear. See *Jones*, 219 Ill. 2d at 31 ("[t]he giving of jury instructions is a matter within the sound discretion of the trial court"); *People v. Washington*, 2012 IL 110283, ¶ 19 ("whether sufficient evidence exists in the record to support the giving of a jury instruction is a question of law subject to *de novo* review"). We need not address this conflict, however, because our determination is the same under either standard of review.

¶ 34    Compulsion is an affirmative defense whereby a defendant is not guilty of an offense "by reason of conduct that he or she performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he or she reasonably believes death or great bodily harm will be inflicted upon him or her, *** if he or she does not perform that conduct." 720 ILCS 5/7-11(a) (West 2010). To warrant an instruction on compulsion, defendant must present "some evidence" sufficient to raise an issue of fact for the jury and create reasonable doubt as to defendant's guilt. *People v. Redmond*, 59 Ill. 2d 328, 338 (1974). However, this defense is not available if defendant had an ample opportunity to withdraw from participation in the offense but failed to do so. *People v. Scherzer*, 179 Ill. App. 3d 624, 645-46 (1989).

¶ 35    For the compulsion defense to apply, the threat of death or great bodily harm must be imminent. *People v. Jackson*, 100 Ill. App. 3d 1064, 1068 (1981). A threat of future injury "is not sufficient to excuse criminal conduct." *People v. Robinson*, 41 Ill. App. 3d 526, 529 (1976); *Jackson*, 100 Ill. App. 3d at 1068. Thus, the evidence must show that the threat against defendant would soon have been carried out if he had not followed the orders of the compeller. *Id*.

¶ 36    *People v. Pegram*, 124 Ill. 2d 166 (1988), is instructive. In *Pegram*, the defendant was at the victim's place of business to perform work. He was confronted by two masked men, one of whom pointed a gun at the defendant's head and told him that he would blow the defendant's brains out if he did not act as requested. *Id.* at 169. The masked men ordered the defendant to take them to the victim, Mackin, and when they got to his office, they ordered Mackin to lie on the floor and empty his pockets. After Mackin did so, the men ordered the defendant to open the freezer door and they pushed Mackin into the freezer. *Id.* The defendant was then ordered to lie on the floor while one of the men stood over him with a gun, and the other man ransacked the office. They then ordered the defendant to take them to Mackin's car. While walking to the car, they had the gun pointed at the defendant. He was ordered to lie on the floor in the back of Mackin's station wagon and about 40 minutes later, the men let the defendant out of the car on an expressway. Meanwhile, back at Mackin's place of business, Mackin managed to smash open the freezer. He notified police of the robbery and later identified the defendant in a police photograph. *Id.* at 170. The court in *Pegram* found that the record presented sufficient evidence that the defendant had been forced, under threat of imminent harm, to participate in the robbery supporting the use of the compulsion instruction. *Id.* at 173.

¶ 37    Here, the evidence showed that Pearson first approached defendant outside the gas station after school asking questions about the gas station. Pearson and defendant walked to Allen's garage, and, soon after, Chapman and Pratt came into the garage. In the garage, Pearson took out a handgun and started waving it around and pointing it at Chapman, Pratt and defendant. Pearson made known his intent to commit a robbery at the gas station and defendant testified that Pearson said he would "knock a patch" in defendant's head. However, the actual robbery and shooting did not occur until around 8:20 p.m., hours after the incident in Allen's garage. In that time,

plans for the robbery were discussed and they even made a dry run where defendant entered the store and purchased a cigarette to test out the plan. Although Pearson had the gun on his person, defendant acknowledged that Pearson made no other threats and after the incident in the garage, he did not point the gun at defendant. Unlike *Pegram*, where threats were made and soon after the defendant participated with a gun pointed at him at points throughout the commission of the crime, the evidence here does not support defendant's contention that the threat of death or great bodily harm to him was imminent.

¶ 38    Furthermore, "[t]he defense of compulsion is not available to one who passes up an opportunity to withdraw from the criminal enterprise." *Scherzer*, 179 Ill. App. 3d at 645-46. In *People v. Colone*, 56 Ill. App. 3d 1018, 1020-21 (1978), the defendant was visiting his girlfriend's house when he heard a group of men planning a robbery. The next morning, another man came to the house and pointed a gun at the defendant telling him he looked like a " 'creep.' " *Id.* at 1020. Pointing the gun at the defendant, the man told him to go to the intended victim's house and ring the bell. The defendant did so and the grandmother in the house answered the door. The defendant returned to his girlfriend's house and told the group there that he saw only the grandmother and a little girl in the house. The defendant testified that he had heard the man with the gun had a reputation for being a killer and he acted because he feared for his life. The group left to commit the robbery at the victim's house and defendant stayed at his girlfriend's house until they left. *Id.* at 1021.

¶ 39    This court found that "the evidence before us proves beyond reasonable doubt that the defendant may not avail himself of the defense of compulsion." *Id.* It reasoned that given the defendant's testimony and statement, he did not have a reasonable belief he was in imminent danger of death or great bodily harm because he had ample opportunities to withdraw and failed

to take steps in that direction. *Id*. The court pointed to the fact that when he rang the victim's doorbell alone, he could have notified the people inside of the impending robbery. Also, when he returned to his girlfriend's house and the group left to commit the robbery, the defendant "could have notified the police with safety at any time." *Id*. It concluded that defendant's failure to take these opportunities "demonstrates the absence of compulsion." *Id*.

¶ 40    Likewise, in the case at bar, defendant also had opportunities to withdraw from the criminal enterprise. Defendant testified that when they left Allen's house to commit the robbery, he took a separate route from Pearson and Allen. Defendant had two cell phones with him. Although he was instructed to call Pearson and Allen once he got to the gas station parking lot, he was not constantly talking to them on the phone while en route. Defendant also acknowledged that on his way to the gas station, he could not be seen by Pearson and Allen at all times as he passed a couple of businesses. He could have gone into one of the businesses on the way to the gas station and safely notified police of the robbery, but he did not do so. On the dry run prior to the actual robbery, when defendant went into the store to purchase a cigarette while Pearson waited outside, defendant could have warned Amir that a robbery was being planned and to notify police as a precaution. As we found in *Colone*, defendant's failure to avail himself of these opportunities "demonstrates the absence of compulsion." *Colone*, 56 Ill. App. 3d at 1021.

¶ 41    Defendant argues that he presented sufficient evidence to allow for a compulsion instruction, primarily citing *People v. Sims*, 374 Ill. App. 3d 231 (2007), and *People v. Adcock*, 29 Ill. App. 3d 917 (1975), as support. *Sims* is distinguishable because the 15-year-old defendant was threatened immediately before getting into a car to commit the robbery that he was "there when it started" and had "to be there for the finish." (Emphasis and internal quotation marks omitted.) *Sims*, 374 Ill. App. 3d at 268. The person made this threat in a menacing manner and

held a gun while speaking to the defendant. Here, Pearson did not make any threats against defendant immediately prior to committing the robbery.

¶ 42    In *Adcock*, evidence was presented that the defendant was in a truck for a time without the offender who had threatened him, but the court allowed a compulsion defense finding that he had presented sufficient evidence to show fear of imminent bodily harm and the question should go to the jury. *Adcock*, 29 Ill. App. 3d at 919-20. However, *Adcock*, which was decided prior to *Scherzer* and *Colone*, did not even consider whether the defendant had an opportunity to withdraw. It is now well-settled that the defense of compulsion is not available "if the defendant had ample opportunities to withdraw from the criminal enterprise but failed to do so." *Sims*, 374 Ill. App. 3d at 267. As discussed above, we are not persuaded that defendant has presented sufficient evidence to support an instruction for compulsion. The trial court did not err in denying defendant's request to give the jury a compulsion instruction.

¶ 43    Defendant next contends that the trial court erred in precluding as hearsay Chapman's testimony about Pearson's threats in the garage. We note that other than providing a citation supporting the general law of hearsay, defendant's analysis of the issue contains no other citations to authority. Therefore, defendant has waived review of this issue pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Jan. 1, 2016) (argument "shall contain the contentions of the appellant and the reasons therefor, with citations of the authorities and the pages of the record relied on").

¶ 44    Furthermore, the trial court did not commit error here. Generally hearsay, which is an out-of-court statement offered to establish the truth of the matter asserted, is not admissible because the credibility of such statements depends on that of an out-of-court declarant who is unavailable for cross-examination. *People v. Gayfield*, 261 Ill. App. 3d 379, 387 (1994).

However, if the statement is offered for a purpose other than the truth of the matter asserted, it is not hearsay and is admissible. *Id.* at 387-88. Defendant argues that Chapman's statements about Pearson's threats should have been admitted to show defendant's state of mind, and that his state of mind is relevant to the issue of compulsion. This exception, however, is to establish the declarant's state of mind, not a listener's. Statements indicating the declarant's state of mind are admissible as exceptions to the hearsay rule if the declarant is unavailable to testify, there is a reasonable probability that the statements is truthful, and the declarant's state of mind is a relevant issue in the case. *People v. Floyd*, 103 Ill. 2d 541, 546 (1984). This exception is not applicable here.

¶ 45    Even if error occurred when the trial court precluded Chapman's testimony, the error was harmless. Chapman, Pratt and defendant testified about Pearson's actions in the garage. They stated that he had a gun, was waving it around, and pointed the weapon at Chapman, Pratt and defendant. Pearson's actions with the gun certainly indicated a threat to defendant. Furthermore, at trial defendant himself testified about the threats Pearson made to him, which is even more relevant to defendant's state of mind on the compulsion issue. Defendant was not prejudiced by the exclusion of Chapman's testimony.

¶ 46    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 47    Affirmed.