# Illinois Official Reports

## Appellate Court

---

### *People v. Williams*, 2021 IL App (1st) 190239

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PRERACIO WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-19-0239 |
| Filed | September 22, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-1794401; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Lauren A. Bauser, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Justices Ellis and Burke concurred in the judgment and opinion. |

¶ 1        Defendant, Preracio Williams, appeals the trial court's denial of his motion for leave to file his *pro se* successive postconviction petition. On appeal, defendant argues that the trial court erred in denying leave to file his successive postconviction petition because he set forth a colorable claim of actual innocence supported by newly discovered evidence from three witnesses that establish a defense of compulsion.

¶ 2        In October 2010, defendant and his codefendant, Jason Foster, were charged with various offenses, including attempted armed robbery, attempted first degree murder, aggravated discharge of a firearm and burglary, related to the June 8, 2010, attempted armed robbery of a pawn shop located at 5900 West Fullerton Avenue in Chicago. Defendant and Foster were also charged with first degree felony murder, which alleged that during the commission of the above offenses, "they set in motion a chain of events that caused the death" of their co-offender Michael McMillion. Following the indictment, the State tendered discovery, which included a DVD surveillance recording showing Foster firing two gun shots during the offense, and the owner of the pawn shop returning fire in defense, striking, and killing McMillion.

¶ 3        In November 2011, Foster successfully moved for severance of his trial from defendant's due to antagonistic defenses. In May 2013, the parties told the court that defendant rejected a 23-year plea offer for first degree murder. Defendant confirmed that he was rejecting the offer. The case was set for trial.

¶ 4        On August 9, 2013, the day jury selection was to begin in defendant's trial, the parties informed the court that defendant had chosen to accept the State's plea offer of 23 years for first degree murder. Defendant signed written waivers of his right to a jury trial and to a presentence investigation report (PSI). The court read the first degree murder charge and informed defendant that the sentencing range for first degree murder was 20 to 60 years in prison. The court admonished defendant regarding the rights he was waiving by pleading guilty, including his right to a jury trial or a bench trial as well as his right to present evidence in his defense, to cross-examine, and to confront witnesses. For each right, defendant replied that he understood and waived those rights. Defendant acknowledged that he wanted to plead guilty, he had not been subjected to force or threats to induce his plea, and he was pleading freely and voluntarily.

¶ 5        The court then heard the factual basis for the plea from the State. According to the prosecutor, if the case proceeded to trial, the evidence would show that on June 8, 2010, defendant, Foster, and McMillion entered the pawn shop located at 5900 West Fullerton Avenue. While in the pawn shop, defendant, Foster, and McMillion "committed the offense of attempt armed robbery with a dangerous weapon *** and during the commission of that offense, they did set in motion a chain of events that did eventually, or during the course of that felony, caused the death" of McMillion. Defendant stipulated to the factual basis for the plea.

¶ 6        The court then found that defendant understood the nature of his charge, the possible consequences of pleading guilty, and had agreed to the factual basis. The State informed the court that defendant had prior convictions for a Class 1 felony controlled substance offense in 2004 and for unlawful use of a weapon by a felon in 2007. The court explained defendant's right to a PSI, and defendant confirmed his waiver of that right. The State nol-prossed the remaining charges. The court explained defendant's appeal rights and gave him an opportunity

to address the court, which he declined. The court then sentenced him, as agreed, to a term of 23 years in prison. Defendant did not file a motion to withdraw his guilty plea or a direct appeal.

¶ 7    In February 2015, defendant filed his initial *pro se* postconviction petition. He alleged ineffective assistance of counsel for failure to obtain readily available evidence of other suspect's involvement, to conduct a reasonable investigation by interviewing and subpoenaing witnesses, and to present a compulsion defense. Specifically, he alleged that he and his mother Dorothy Williams (Williams) told counsel that he had been "compelled to commit robbery which lead [*sic*] to the death" of McMillion and his trial counsel was ineffective for not presenting a compulsion defense and failing to subpoena Williams as a witness to support that defense. Defendant also claimed that he asked counsel to interview Foster and counsel failed to do so. Defendant further alleged that counsel "coerce[d]" him on August 8, 2013, to plead guilty the next day "by telling him he would get 75 years in prison if he did not plea guilty [*sic*], because compulsion was not a legal defense."

¶ 8    Defendant attached affidavits from Foster and Williams, as well as his own affidavit to the petition. Defendant stated in his affidavit that he told counsel on August 7, 2013, two days before trial, to interview Foster and reiterated that he was compelled to commit armed robbery. When counsel returned the next day, counsel informed defendant that "compulsion is not a legal defense for felony murder." Defendant further stated that counsel "coerced" him to plead guilty by telling him that "it was guaranteed" that he would be found guilty and "receive the maximum of 75 years in prison." Counsel also told defendant that the prosecutor agreed with counsel to give defendant "23 years at 100% if [he] pled guilty to first degree felony murder."

¶ 9    Williams stated in her affidavit that she met with counsel in May 2012 about defendant's case and "explained in vivid detail *** that [her] son was forced and compelled to commit the offense of felony murder." She further stated that defendant "begged" her for $15,000, but she refused. As he left, she thought about giving him the money because she had "never seen him look so worried before." She then saw Foster "force him into a car," and she called out to defendant, who replied that he would call her later. While defendant was in Cook County jail, he wrote Williams a letter explaining why he needed the money, but she did not disclose what that need was. She told counsel of these circumstances, and he "promised that if [she] hired him he would get the charges dismissed because according to the law [defendant] was not accountable for his codefendant's murder." Instead, counsel "convinced" defendant to accept a plea offer "to even more time than the previous offer."

¶ 10    In his affidavit, Foster stated that he and McMillion had demanded $15,000 from defendant for bond for McMillion's cousin because they blamed defendant for the cousin's arrest. When defendant told them that he could not raise that sum, they told him that they would kill him if he did not join in their planned robbery. Foster "could tell by the fear in [defendant's] eyes he was afraid and did not want to die." Foster did not provide any additional details of any threats made to defendant. Foster stated that he was willing to disclose this information because he had "found God" and has "found peace." Foster stated that he took "full responsibility forcing [defendant] into the crime."

¶ 11    In May 2015, the trial court summarily dismissed the petition, finding that defendant entered a knowing and voluntary guilty plea in exchange for a negotiated sentence close to the minimum 20-year sentence. The court also found that the affidavits of defendant, Foster, and

Williams did not establish a legal defense of compulsion because the affidavits did not establish when Foster threatened defendant.

¶ 12 In August 2017, this court affirmed the trial court's first stage dismissal of defendant's postconviction petition. *People v. Williams*, 2017 IL App (1st) 151959-U. We held that defendant failed to state the gist of a meritorious claim of ineffective assistance of trial counsel. We found "no arguable merit" to defendant's claim that his trial counsel was ineffective for failing to interview Foster because Foster's trial had been severed from defendant's due to antagonistic defenses and his trial date was scheduled after defendant's trial date. *Id.* ¶ 17. While we agreed with defendant that compulsion is a valid legal defense to felony murder, we concluded that defendant "failed to show in his petition with factual rather than conclusory allegations that counsel's advice, allegedly causing him to accept the plea offer, was erroneous." *Id.* ¶ 20. We specifically observed that defendant failed to provide any evidence to establish when the alleged threats were made to support the imminence required for a compulsion defense. *Id.* ¶ 24.

¶ 13 In October 2018, defendant filed a *pro se* motion for leave to file a successive postconviction petition and asserted that he did not previously raise claims of actual innocence and compulsion because "the factual basis for those claims were not previously available due to threats and fear of gang retaliatory violence toward material witnesses needed to [corroborate] claims." In his attached *pro se* successive postconviction petition, defendant argued that he had newly discovered evidence of his actual innocence due to compulsion. He could not have presented these witnesses at trial due to their fear and would have shown that defendant "did not assist in the robbery except by coercion/compulsion." Defendant attached affidavits from three new witnesses, Jamokae Smith, Toheeb Longe, and Kendall Johnson, as well as his own affidavit, and asked the trial court to take judicial notice of the previously filed affidavits from codefendant Foster and his mother Williams.

¶ 14 Smith stated in his affidavit that on June 8, 2010, at approximately 12:45 p.m., Darron Thomas, the chief of the Vice Lords gang, picked him up from his house. Thomas then drove to defendant's mother's day care center, located at North Avenue and Lotus Street in Chicago, and parked in front of the day care. Thomas told Smith that defendant owed him $15,000, and earlier that day, Thomas had threatened to kill both defendant and Williams. Thomas further told Smith that if McMillion called him and said that defendant did not help with the pawn shop robbery, Thomas wanted Smith to kill Williams. Smith came forward now because he saw defendant in prison and he told defendant he would be willing to testify about the events of June 8, 2010, because the Vice Lords are no longer in control of the neighborhood and his life was not in danger.

¶ 15 In his affidavit, Longe stated that on June 8, 2010, he was present in an apartment with Thomas. At that time, he witnessed McMillion and Foster "force" defendant inside to speak with Thomas at gunpoint. Thomas "put a gun to the head of [defendant] and threatened to kill him and his mother if he didn't help [McMillion] and [Foster] rob a pawn shop." He heard Thomas tell defendant that the gun he put to defendant's head did not work and to give that gun to defendant. Thomas told McMillion to kill defendant if he did not carry the broken gun into the pawn shop to help them rob it. After leaving the apartment, Longe saw McMillion and Foster "force" defendant into a car, "telling him if he didn't get in, they would shoot him." Longe stated that defendant had attempted to contact him several times to speak with his attorney about what he had witnessed in the apartment, he refused because Thomas had

- 4 -

threatened his life and the lives of his family. He came forward now because he learned that Thomas was shot and killed in the summer of 2015 and was no longer a threat to him and his family.

¶ 16 Johnson stated in his affidavit that on June 8, 2010, he was present at a meeting of the Vice Lords gang when Foster and McMillion forced defendant into the apartment at gunpoint. Thomas threatened to kill defendant and his mother if he did not use a broken gun and help McMillion and Foster rob the pawn shop. Defendant "didn't have a choice but to help rob the pawn shop." Thomas told defendant "he was going to sit and wait outside [defendant's] mother['s] job" If McMillion called and said defendant did not help in the robbery, Thomas was going to kill defendant's mother. Johnson did not tell the police or defendant what happened on June 8, 2010, because he was afraid of the Vice Lords. He came forward because he moved out of state and his life was no longer in danger.

¶ 17 In his own affidavit, defendant stated that he was actually innocent of the charges and did not have the intent to rob or kill anyone. He could not have used the newly discovered evidence in his previous petition because he had "no way of relieving the fear of the newly discovered eyewitnesses from the dangers of a violent street gang. To this day, both my mother and I was and still are afraid." He stated that he knew the "Drug Lords in Chicago" have a history of "retaliatory violence against informants and others who interfere with their business." Defendant concluded by stating, "The only role I played in the robbery was forced target to be shot by the robbers and victims while I held an inoperable gun."

¶ 18 In November 2018, the trial court denied defendant leave to file his successive postconviction petition. This appeal followed.

¶ 19 On appeal, defendant argues that he set forth a colorable claim of actual innocence based on the newly discovered evidence of three witnesses. Specifically, defendant contends that the affidavits from Smith, Longe, and Johnson support his claim that he was actually innocent of the armed robbery based on the defense of compulsion.

¶ 20 The Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *Id.* § 122-1(a); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999).

¶ 21 However, the Post-Conviction Act only contemplates the filing of one postconviction petition with limited exceptions. 725 ILCS 5/122-1(f) (West 2016); see also *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002). The supreme court has recognized two bases upon which the bar against successive proceedings will be relaxed. *People v. Edwards*, 2012 IL 111711, ¶ 22. The first is, under section 122-1(f), a defendant must satisfy the cause and prejudice test for failure to raise the claim earlier in order to be granted leave to file a successive postconviction petition. 725 ILCS 5/122-1(f) (West 2016). The second basis to relax the bar against a successive postconviction is "what is known as the 'fundamental miscarriage of justice' exception." *Edwards*, 2012 IL 111711, ¶ 23. "The United States Supreme Court has stated that the exception serves 'as an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty [citation], guaranteeing that the ends of justice will

be served in full.' " *Id.* (quoting *People v. Szabo*, 186 Ill. 2d 19, 43 (1998) (Freeman, C.J., specially concurring, joined by Heiple, J.), citing *McCleskey v. Zant*, 499 U.S. 467, 495 (1991)).

¶ 22 "In order to demonstrate a miscarriage of justice to excuse the application of the procedural bar, a petitioner must show actual innocence." *Id.* With respect to those seeking to relax the bar against successive postconviction petitions on the basis of actual innocence, the supreme court has held that "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Id.* ¶ 24. "Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). We review the trial court's denial of leave to file a successive postconviction petition *de novo. People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 23 To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; see also *People v. Jackson*, 2021 IL 124818, ¶ 41. "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Robinson*, 2020 IL 123849, ¶ 47. Evidence is material if it is relevant and probative of the petitioner's innocence. *Id.* Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* "[T]he conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.* "At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Id.* ¶ 45. "In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations." *Id.*

¶ 24 Recently, the supreme court addressed an issue of first impression: whether a defendant who pleads guilty waives any claim of actual innocence under the Post-Conviction Act. *People v. Reed*, 2020 IL 124940, ¶ 24. In resolving that issue, the court considered the motives and consequences of a plea in light of a collateral attack on the basis of actual innocence. *Id.*

¶ 25 The *Reed* court observed that both the State and defendants benefit and make concessions in plea agreements. The State benefits because plea agreements are often prompt and provide finality to most criminal cases, resulting in preservation of prosecutorial and judicial resources. *Id.* ¶ 25. These benefits motivate the State to make concessions, such as forgoing the opportunity to present the entirety of the evidence, dismissing charges, and ceasing investigation that may lead to additional charges. *Id.* On the other hand, defendants also incur "substantial benefits" as a result of a plea agreement, such as, a favorable sentence, dismissal of other charges, and avoiding the cost and time associated with trial. *Id.* ¶ 26. However, the consequences of a plea for defendants are severe as "[a] guilty plea is an admission of guilt and a conviction in and of itself." *Id.* ¶ 27. A plea relieves the State of its burden to prove a defendant guilty beyond a reasonable doubt, and by pleading guilty, a defendant " 'waives all nonjurisdictional defenses or defects,' including constitutional ones." *Id.* (quoting *People v. Burton*, 184 Ill. 2d 1, 27 (1998)).

¶ 26    There, the State argued that allowing the defendant's claim of innocence would dissuade it from entering into future plea negotiations because it would be providing concessions without the benefit of finality. *Id.* ¶ 28. The supreme court disagreed and reasoned that "our constitution affords additional due process when newly discovered evidence shows that a convicted person is actually innocent on the basis that '[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws.' " *Id.* ¶ 29 (quoting Ill. Const. 1970, art. I, § 2). The *Reed* court noted that a claim of actual innocence is separate and independent from a challenge to the sufficiency of the evidence or a claim there was an error in the proceedings that led to a defendant's conviction. *Id.* ¶¶ 29, 31. Thus, a "defendant's waiver of his right to challenge the State's proof of guilt beyond a reasonable doubt at trial should not impact his actual innocence claim." *Id.* ¶ 31. The supreme court further explained that while plea agreements are "vital to our criminal justice system," they are not "structured to 'weed out the innocent' or guarantee the factual validity of the conviction." *Id.* ¶ 33 (quoting *Schmidt v. State*, 909 N.W.2d 778, 788 (Iowa 2018)). "The plea system encourages defendants to engage in a cost-benefit assessment where, after evaluating the State's evidence of guilt compared to the evidence available for his defense, a defendant may choose to plead guilty in hopes of a more lenient punishment than that imposed upon a defendant who disputes the overwhelming evidence of guilt at trial." *Id.* "As such, it is well accepted that the decision to plead guilty may be based on factors that have nothing to do with defendant's guilt." *Id.*

¶ 27    Further, Illinois court rules allow a trial court to accept a guilty plea even in those cases where a defendant asserts his innocence, as long as a sufficient factual basis exists, and the court provides the required admonishments. *Id.* ¶ 34.

> "Unlike a conviction after trial, where the State's evidence is scrutinized and must meet the beyond a reasonable doubt standard, the factual basis to support the plea is held to a less stringent level of proof, requiring only a basis from which the court could reasonably conclude that defendant actually committed the acts constituting the offense to which defendant is pleading guilty." *Id.*

¶ 28    Based on this reasoning, the supreme court concluded that the defendant's "waiver of his right to challenge the State's proof of guilt beyond a reasonable doubt at trial in the proceedings that led to his conviction does not prevent him from asserting his right to not be deprived of life and liberty given compelling evidence of actual innocence under the Act." *Id.* ¶ 37. A "claim of innocence is not based on the defendant's misapprehension of the quality of the State's case nor an error of the court in finding defendant guilty. Rather, it is a request for the additional due process that is triggered by new and compelling evidence demonstrating defendant's innocence." *Id.* ¶ 40.

¶ 29    The *Reed* court then set forth the standard for actual innocence claims raised by a defendant who pled guilty.

> "We therefore find a successful actual innocence claim requires a defendant who pleads guilty to provide new, material, noncumulative evidence that clearly and convincingly demonstrates that a trial would probably result in acquittal. New means the evidence was discovered after the court accepted the plea and could not have been discovered earlier through the exercise of due diligence. [*People v. Coleman*, 2013 IL 113307,] ¶ 96. This is a comprehensive approach where the court must determine whether the new evidence places the evidence presented in the underlying proceedings

- 7 -

in a different light and 'undercuts the court's confidence in the factual correctness' of the conviction. *Id.* ¶ 97.

> This higher standard strikes an equitable balance between the defendant's constitutional liberty interest in remaining free of undeserved punishment and the State's interest in maintaining the finality and certainty of plea agreements, while vindicating the purpose of the criminal justice system to punish only the guilty. Because the evidence must be clear and convincing, the standard inherently requires the court to consider the evidence to be reliable. We therefore see no reason to further limit defendants who plead guilty by requiring them to support their petition with forensic evidence." *Id.* ¶¶ 49-50.

¶ 30    Thus, under *Reed*, defendant in the present case has not been foreclosed from raising a claim of actual innocence in his successive postconviction petition due to his guilty plea.

¶ 31    With this framework in mind, we turn to the merits of defendant's actual innocence claim. Defendant contends that he set forth a colorable claim of actual innocence based on newly discovered evidence that supports his innocence based on the defense of compulsion. In response, the State asserts that defendant's claim of actual innocence fails because the claim is not premised on "factual innocence," but instead his claim of actual innocence based on compulsion only constitutes "legal innocence," which is not viable under the Post-Conviction Act.

¶ 32    Compulsion is an affirmative defense whereby a person is not guilty of an offense "by reason of conduct that he or she performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he or she reasonably believes death or great bodily harm will be inflicted upon him or her, or upon his or her spouse or child, if he or she does not perform that conduct." 720 ILCS 5/7-11(a) (West 2016). "For the compulsion defense to apply, the threat of death or great bodily harm must be imminent." *People v. Collins*, 2016 IL App (1st) 143422, ¶ 35. "A threat of future injury 'is not sufficient to excuse criminal conduct.' " *Id.* (quoting *People v. Robinson*, 41 Ill. App. 3d 526, 529 (1976)). The evidence must show that the threat against the defendant would soon have been carried out if he had not followed the orders of the compeller. *Id.* "Compulsion is an affirmative defense which would exculpate an accused, if the trier of fact believed that the elements of compulsion had been proven." *People v. Pegram*, 124 Ill. 2d 166, 172 (1988).

¶ 33    According to the State, compulsion amounts to legal innocence, not factual innocence, and cannot support a colorable claim of actual innocence. However, none of the cases relied on by the State find that an affirmative defense, such as compulsion or self-defense, in which the defendant would be excused for his actions cannot support a claim of actual innocence.

¶ 34    In *People v. Ortiz*, 235 Ill. 2d 319 (2009), the supreme court considered a defendant's claim of actual innocence after the trial court denied his claim following a third stage evidentiary hearing. In that case, the defendant's claim of actual innocence was based on newly discovered evidence from an eyewitness asserting that the defendant was not present during the commission of the crime. *Id.* at 336. The defendant did not raise an affirmative defense in his actual innocence claim.

¶ 35    In *Edwards*, 2012 IL 111711, ¶¶ 10, 12, the defendant raised a claim of actual innocence in his successive postconviction petitions based on newly discovered evidence of affidavits setting forth an alibi for the crime. As discussed above, the supreme court held that "leave of court should be denied only where it is clear, from a review of the successive petition and the

documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Id.* ¶ 24. The *Edwards* court then reviewed the affidavits attached to the defendant's petition and found that they failed to satisfy the requirements for an actual innocence claim because two of the affidavits could not be considered newly discovered and the third affidavit was not of such conclusive character that it would probably change the result on retrial. *Id.* ¶¶ 34-40. Again, the defendant did not allege an affirmative defense to support his actual innocence claim.

¶ 36    In *People v. Coleman*, 2013 IL 113307, ¶ 1, the defendant appealed the trial court's denial of postconviction relief on his claim of actual innocence following an evidentiary hearing. At the hearing, multiple witnesses admitted their involvement in the crimes and testified that the defendant was not present. *Id.* ¶ 103. The supreme court reviewed all the witnesses' testimony, and while some of the witnesses were not newly discovered, the court concluded that the testimony of five of the witnesses sufficiently set forth a claim of actual innocence. *Id.* ¶¶ 102-13. As in the other cases, the defendant's claim of actual innocence did not involve an affirmative defense.

¶ 37    The State also relies on the supreme court's recent decision in *Reed* and contends that the *Reed* decision "distinguished between factual innocence which is cognizable—and legal innocence when it 'reject[ed] the state's contention that the record of the plea proceedings positively rebutted any claim of actual innocence' and stressed that an admission of guilt… *is not guilt in fact*." (Emphasis in original.) However, as discussed above, *Reed* addressed whether a defendant who pled guilty may later raised a claim of actual innocence. The *Reed* decision did not consider the viability of legal versus factual innocence. In fact, the term "legal innocence" is not used in any of the supreme court cases relied on by the State.

¶ 38    We also find the decision in *People v. Quickle*, 2020 IL App (3d) 170281, to be distinguishable from the facts present here. In that case, the defendant was charged with intentional murder, knowing murder, and felony murder where the victim died during the commission of an armed robbery. *Id.* ¶ 3. Following a jury trial, the defendant was found guilty of murder and armed robbery. *Id.* ¶ 7. In his second successive postconviction petition, the defendant alleged that he was actually innocent of the crimes because the trial court failed to provide the separate verdict forms he had requested. *Id.* ¶ 24.

¶ 39    The reviewing court observed that "[f]or purposes of the actual innocence exception, ' "actual innocence" means factual innocence, not mere legal insufficiency.' " *Id.* ¶ 20 (quoting *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)). " 'The required evidence must create a colorable claim of actual innocence, that the petitioner "is innocent of the charge for which he [is] incarcerated," as opposed to legal innocence as a result of legal error.' " *Id.* (quoting *Gandarela v. Johnson*, 286 F.3d 1080, 1085 (9th Cir. 2002), quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 452 (1986)).

¶ 40    The defendant asserted that he fell within the "actual innocence" exception for successive postconviction petitions because "the general guilty verdict entered against him must be construed as an acquittal of knowing and intentional murder, making him innocent of those types of murder." *Id.* ¶ 22. The defendant's argument relied on the supreme court decisions in *People v. Smith*, 233 Ill. 2d 1 (2009), and *People v. Bailey*, 2013 IL 113690. In *Smith*, the supreme court held that when the trial court refused the defendants' request for separate verdict forms, "the appropriate remedy is to interpret the general verdict as a finding on felony murder." *Smith*, 233 Ill. 2d at 28. Similarly, in *Bailey*, the supreme court held that a trial court's

error in refusing a defendant's request for separate verdict forms requires that a general guilty verdict of first degree murder be viewed "as an acquittal on the counts of intentional and knowing murder." *Bailey*, 2013 IL 113690, ¶ 64.

¶ 41    The *Quickle* court found that while the general guilty verdict for murder was viewed as an acquittal for intentional and knowing murder, the defendant had failed to establish a claim of actual innocence. *Quickle*, 2020 IL App (3d) 170281, ¶ 23. "In order for defendant to invoke the 'actual innocence' exception, he has to show that he is factually innocent of knowing and intentional murder." *Id.* The reviewing court agreed that the trial court erred in failing to provide separate verdict forms, but that error "results in defendant's legal, not factual, innocence of intentional and knowing murder." *Id.* ¶ 24. Since the defendant did not assert that he was factually innocent of intentional or knowing murder nor did he allege cause and prejudice in his petition, his claim failed. *Id.* ¶¶ 24-25.

¶ 42    *Quickle* illustrates the difference between factual and legal innocence. As discussed, legal innocence related to a trial error, *i.e.*, the trial court's failure to provide separate verdict forms, rather than a claim that would exculpate the defendant from criminal liability. The defendant in *Quickle* did not assert an actual innocence claim supported by evidence that was newly discovered, material, and noncumulative, and of such conclusive character that it would probably change the result on retrial. See *Robinson*, 2020 IL 123849, ¶ 47. Further, *Quickle* did not involve a claim based on an affirmative defense to justify the defendant's actions. For these reasons, *Quickle* does not support the State's argument in the present case.

¶ 43    Moreover, Illinois courts have repeatedly recognized the viability of an actual innocence postconviction claim based on newly discovered evidence in support of an affirmative defense. See *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 37 (the reviewing court found the defendant made a substantial showing of actual innocence based on newly discovered evidence supporting the defendant's claim of self-defense); *People v. Woods*, 2020 IL App (1st) 163031, ¶ 53 (the reviewing court found the defendant set forth a colorable claim of actual innocence supported by newly discovered evidence regarding the defendant's self-defense claim); *People v. Sparks*, 393 Ill. App. 3d 878, 886-87 (2009) (this court found that the defendant set forth the gist of a meritorious claim of actual innocence in which a new occurrence witness corroborated the defendant's testimony that he acted in self-defense and remanded for further proceedings). While these cases involved the affirmative defense of self-defense, we find no difference in the viability of compulsion under the same analysis. Both compulsion and self-defense affirmative defenses involve the defendant being exculpated from his criminal liability due to these defenses. See 720 ILCS 5/7-1(a), 7-11(a) (West 2016). Further, these affirmative defenses are not challenging a verdict based on a trial court error or constitutional violation, rather as defendant argues here, he is challenging the factual evidence to support his conviction. Accordingly, we reject the State's argument that the affirmative defense of compulsion cannot form the basis of an actual innocence claim.

¶ 44    We now review defendant's claim to determine if he has set forth a colorable claim of actual innocence to warrant further postconviction proceedings. We acknowledge that the trial court lacked the benefit of the opinion in *Reed* to consider defendant's petition under the applicable standard. Under *Reed*'s framework as discussed above, "a successful actual innocence claim requires a defendant who pleads guilty to provide new, material, noncumulative evidence that clearly and convincingly demonstrates that a trial would probably result in acquittal." *Reed*, 2020 IL 124940, ¶ 49. "New means the evidence was discovered

after the court accepted the plea and could not have been discovered earlier through the exercise of due diligence." *Id.* Evidence is material if it is relevant and probative of the petitioner's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* "This is a comprehensive approach where the court must determine whether the new evidence places the evidence presented in the underlying proceedings in a different light and 'undercuts the court's confidence in the factual correctness' of the conviction." *Reed*, 2020 IL 124940, ¶ 49 (quoting *Coleman*, 2013 IL 113307, ¶ 97).

¶ 45    Here, defendant presented three new affidavits from Smith, Longe, and Johnson as well as his previously filed affidavits from his codefendant Foster and his mother. The three affidavits from Smith, Longe, and Johnson satisfy the newly discovered evidence requirement. Each of the men explained they did not come forward sooner because they feared retaliation from Thomas and the Vice Lords gang, but circumstances had since changed. Smith indicated that he came forward because the Vice Lords were no longer in control of his neighborhood, Longe stated that Thomas was killed in 2015, and Johnson stated that he had moved out of state.

¶ 46    Each of the men detailed being present with Thomas on June 8, 2010. Thomas picked up Smith and told him to sit in a car outside defendant's mother's place of employment. If he received a call from McMillion stating that defendant did not participate in the robbery of the pawn shop, he was to kill defendant's mother. Longe was in an apartment with Thomas and witnessed McMillion and Foster force defendant into the apartment at gunpoint to speak with Thomas. Thomas then put a gun to defendant's head and threatened to kill defendant and his mother if he did not help in the robbery. Longe saw Foster and McMillion force defendant into a car and threaten to shoot him if he did not get in. Johnson was also present at a Vice Lords meeting where Foster and McMillion forced defendant into the apartment at gunpoint. Thomas threatened to kill defendant and his mother if he did not carry a broken gun into the pawn shop to help Foster and McMillion.

¶ 47    As explained above, under a compulsion defense, a person is not guilty of an offense
> "by reason of conduct that he or she performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he or she reasonably believes death or great bodily harm will be inflicted upon him or her, or upon his or her spouse or child, if he or she does not perform that conduct." 720 ILCS 5/7-11(a) (West 2016).
"For the compulsion defense to apply, the threat of death or great bodily harm must be imminent." *Collins*, 2016 IL App (1st) 143422, ¶ 35. "A threat of future injury 'is not sufficient to excuse criminal conduct.' " *Id.* (quoting *Robinson*, 41 Ill. App. 3d at 529). The evidence must show that the threat against the defendant would soon have been carried out if he had not followed the orders of the compeller. *Id.*

¶ 48    These affidavits are material and noncumulative because they present evidence that defendant was forced to participate in the armed robbery under imminent threat of death or great bodily harm. Each of the men detailed how Thomas threatened the lives of defendant and his mother if he did not help with the pawn shop robbery. The threats were made the afternoon of the robbery, and Longe and Johnson observed defendant forced into a vehicle with Foster and McMillion at gunpoint. Smith stated that he was instructed to wait outside defendant's mother's job to kill her if contacted. The affidavits are not cumulative because no evidence of the threats was available at the time defendant pled guilty. Additionally, codefendant Foster admitted that he threatened defendant's life, and this court already found that it was unlikely

that Foster would have been allowed to be interviewed due to their antagonistic defenses. *Williams*, 2017 IL App (1st) 151959-U, ¶ 17.

¶ 49 Finally, we conclude that the affidavits provide clear and convincing evidence that defendant participated in the armed robbery because of threats at gunpoint by Foster, McMillion, and Thomas to his life and his mother's life. "The clear and convincing standard requires proof greater than a preponderance, but not quite approaching the criminal standard of beyond a reasonable doubt." *In re D.T.*, 212 Ill. 2d 347, 362 (2004). Here, the affidavits from Smith, Longe, and Johnson, taken as true and reliable, undermine our confidence in the outcome. The affidavits set forth imminent threats made to defendant and provide clear and convincing evidence supporting a defense of compulsion. At this stage of proceedings, we find that defendant has sufficiently set forth a colorable claim of actual innocence and the trial court erred in denying defendant leave to file his successive postconviction petition.

¶ 50 Based on the foregoing reasons, we reverse the trial court's denial of defendant's motion for leave to file his successive postconviction petition and remand for further proceedings consistent with this decision.

¶ 51 Reversed and remanded.